A95A2170. EMORY UNIVERSITY HOSPITAL v. SWEENEY et al.
(469 SE2d 772)

BLACKBURN, Judge.

William Sweeney and his wife filed the underlying medical malpractice action against Emory University Hospital ("Emory") and an unnamed resident who operated on Sweeney. In the malpractice affidavit required to accompany the Sweeneys' lawsuit, the physician asserted that he reviewed various medical records and a report of the Department of Health & Human Services (DHHR) memorandum in analyzing the matter. He concluded that Emory breached the requisite standard of care by not maintaining appropriate sterile technique during Sweeney's surgery. Sweeney obtained a copy of the DHHR memorandum through an open records request. The DHHR memorandum contained information which was disclosed during Emory's peer review process, but was otherwise available from original sources. Emory moved to strike certain paragraphs of the Sweeneys' complaint and malpractice affidavit contending that they were derived from privileged peer review information. The trial court denied the motion, and we granted Emory's application for interlocutory appeal to address the issue of whether the privilege provided to the proceedings

and records of the medical review committee by OCGA § 31-7-143 follows the material and findings after they are obtained with proper authority by another government agency and included in a report issued by such other government agency.

In August 1992 Sweeney underwent brain surgery at Emory. Approximately three weeks later Sweeney was readmitted to Emory with a serious postoperative infection that required removal of the bone flap covering his surgical wound, leaving Sweeney's head disfigured. Sweeney and his wife learned through a variety of sources including an Emory medical student and an Emory nurse that a large number of the hospital's neurosurgery patients were experiencing similar postoperative wound infections. Sweeney attempted to investigate the problem on his own by questioning various doctors and nurses. Sweeney then lodged a complaint with the DHHR, naming four other neurosurgery patients that he knew had experienced similar postoperative infections.

In response to Sweeney's complaint, the DHHR investigated the matter and prepared its report (DHHR memorandum) drawing from a number of different documentary sources including, patient records, policy and procedure manuals, staffing schedules, log books, medical staff rules and regulations and in-service training records, incident reports, employee personnel files, closed medical records, medical staff by-laws, infection control minutes, contracted services, QA/QC committee minutes and medical staff committee documentation (surgery, tissue, credentials, peer review, executive, medicine, and surgery, neurosurgery and treatment room). In addition, the DHHR interviewed the director, director of nursing, department heads (surgery and treatment room), QA/QC coordinator(s), infection control officer and a social worker. The DHHR memorandum reflects that the four patients named by Sweeney had undergone neurosurgery at Emory in 1992 and had suffered "nosocomial[1] surgical wound infections." The DHHR memorandum also noted that two of these patients had their surgeries the same week as Sweeney.

After outlining these initial findings, the DHHR memorandum addressed at length an investigation performed internally by Emory's infection control and quality assurance committees prior to the DHHR investigation. The DHHR memorandum confirmed an unusually high rate of nosocomial infections in the neurosurgery department during the period in question and attributed the high infection rate to "intraoperative" sources. The DHHR memorandum reflects several factors that may have contributed to the infection rate, in-

---

[1] Nosocomial is defined as: "Denoting a new disorder (unrelated to the patient's primary condition) associated with being treated in a hospital." Stedman's Medical Dictionary (23rd ed. 1979).

cluding concerns about a particular neurosurgery resident whose identity was not disclosed.

We first address the general issue of whether the privilege of OCGA § 31-7-143 extends to medical review committee findings subsequently incorporated into the report of a governmental investigatory agency. OCGA § 31-7-143 protects the confidentiality of certain medical review proceedings and findings. It provides in pertinent part: "The proceedings and records of medical review committees shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by such committee. . . . However, information, documents, or records otherwise available from original sources shall not be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee."

Emory argues that the privilege extends to medical review committee findings subsequently incorporated into a DHHR report. We agree. "It is, of course, fundamental that the cardinal rule to guide the construction of laws is, first, to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the legislative intent and purpose." (Punctuation omitted.) *Wall v. Bd. of Elections of Chatham County*, 242 Ga. 566, 573-574 (250 SE2d 408) (1978). In *Eubanks v. Ferrier*, 245 Ga. 763 (267 SE2d 230) (1980), the Georgia Supreme Court upheld the constitutionality of OCGA § 31-7-143 and outlined its purpose, stating that medical review committees play an important role in guaranteeing "the delivery of quality health care services by providing a method for the in-house review of clinical work performed in the hospital." Id. at 765. In recognition of their importance, the statute accords privileged status to medical review committee communications and findings because of concern that the candor necessary for these committees would be destroyed if their proceedings and conclusions were subject to use in malpractice litigation. Id.

To permit a plaintiff to use privileged material simply because it is subsequently included in a government agency report would frustrate the statute's policy of encouraging candor among medical review committees. Fearing that incriminating information discovered in the peer review process could be incorporated into a DHHR report that could later form the basis of a malpractice lawsuit, hospitals and medical professionals might be tempted not to conduct such reviews as often or as thoroughly as may be warranted.

It is apparent that those proceedings and records of medical review committees which are not subject to discovery or introduction into evidence under the provisions of OCGA § 31-7-143, do not lose their protected status as a result of being disclosed to an authorized

government agency or by virtue of the inclusion of such material into its report by such government agency. OCGA § 50-18-70 (b) provides: "All public records of an agency as defined in subsection (a), *except those which* by order of a court of this state or *by law are prohibited or specifically exempted from being open to inspection by the general public*, shall be open for a personal inspection by any citizen of this state at a reasonable time and place; and those in charge of such records shall not refuse this privilege to any citizen." (Emphasis supplied.) Any material provided for in OCGA § 31-7-143, in the control of any government agency, is not subject to inspection or release under the provisions of OCGA § 50-18-70 and any such material should be redacted from any reports which the agency is otherwise required to make available for inspection or release to the general public.

OCGA § 31-7-143 does not prohibit disclosure of information, documents, or records otherwise available from original sources because they were presented during medical review committee proceedings, nor does it preclude any person who testified before such committee from testifying as to matters within his knowledge although such person may not be questioned regarding his testimony before such a committee or opinions formed by such witness as a result of such committee hearing. These same standards of disclosure of medical review committee proceedings and records govern the review and release of such material under the provisions of OCGA § 50-18-70 (b). See also *Hollowell v. Jove*, 247 Ga. 678 (279 SE2d 430) (1981) (the evidentiary privilege provided to medical review committee findings is to be construed in the least expansive manner that will fulfill legislative intent and purpose).

Emory makes the assertion that the portions of the Sweeneys' pleadings it seeks to strike could only have come from the peer review materials. It offers no evidence that the allegations contained within the complaint or the assertions contained within the malpractice affidavit could not have been reached without the peer review materials. In fact, the DHHR memorandum incorporated information from a number of sources in addition to peer review materials. Further, in arriving at his opinion, the doctor who executed the malpractice affidavit reviewed various medical records in addition to the DHHR memorandum. Even if there is information in the DHHR memorandum which *might* have come from the proscribed medical review committee material, Emory has failed to show that such material *did* come from medical review committee records, rather than from independent original sources or witnesses interviewed separately by DHHR investigators. Where as here, the information was available from original or other sources, we cannot assume that the peer review process was plaintiffs' source or that such material or information is

thus privileged. To do so would be contrary to the terms of OCGA § 31-7-143 and would invite the abuse of the peer review process by medical professionals by the simple expedient of insuring that all possible sources of inculpatory evidence were presented to the peer review committee. The purpose of the medical review process privileges is to protect the process for the public good, not to protect physicians from being held accountable for their tortious conduct. It was never intended that the peer review process be used in such a way as to effectively bar a plaintiff's tort action. See *Cobb County Kennestone Hosp. Auth. v. Martin*, 208 Ga. App. 326 (430 SE2d 604) (1993); *Dept. of Transp. v. Taunton*, 217 Ga. App. 232, 233 (457 SE2d 570) (1995) (" 'motions to strike are not favored and should not be granted unless it is clear that the matter sought to be stricken can have no possible bearing upon the subject matter of the litigation' ").

Emory contends that the fact that the language is essentially the same in some of the medical review committee records as in plaintiffs' complaint, the physician's affidavit and in the DHHR memorandum, establishes that such records were the source of the information. This similarity does not prove that plaintiffs obtained such information from the peer review records rather than from independent original sources or from independent interviews of witnesses, either by plaintiffs or DHHR investigators. Similarity in language would be expected from those reaching the same conclusion, especially if each obtained their information and material from the same original sources. How else would one expect the conclusions to be stated?

The trial court did not err in denying defendant's motions to strike.

*Judgment affirmed. McMurray, P. J., and Andrews, J., concur.*

DECIDED MARCH 7, 1996.

*Long, Weinberg, Ansley & Wheeler, Sidney F. Wheeler, Stephen H. Sparwath, J. Calhoun Harris, Jr.*, for appellant.

*Bird, Ballard & Still, William Q. Bird, John G. Mabrey, Karin L. Allen*, for appellees.